**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

|  |  |
|---|---|
| **WESLEY WALKER**, |  |
| Plaintiff, |  |
| v. | Civil Action No. 7:19-CV-195 (HL) |
| **UNITED PARCEL SERVICE, INC.**, |  |
| Defendant. |  |

**ORDER**

Plaintiff Wesley Walker, a former employee of Defendant United Parcel Service, Inc. ("UPS"), filed this lawsuit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* ("Title VII"), alleging Defendant discriminated and retaliated against him based on his gender when Defendant terminated him while retaining a female employee accused of similar conduct. Plaintiff additionally asserts he was subjected to a hostile work environment based on his sex while working for Defendant. Before the Court is Defendant's Motion for Summary Judgment. (Doc. 26). After reviewing the pleadings, briefs, depositions, and other evidentiary materials, the Court concludes there is no genuine dispute of the material facts and finds Defendant is entitled to judgment as a matter of law. The Court therefore **GRANTS** Defendant's Motion for Summary Judgment. (Doc. 26).

## I.    BACKGROUND

Plaintiff's Employment History

Wesley Walker began working for UPS as a part-time loader and unloader in 2005. (DSOMF ¶ 8).[1] Less than a year later, UPS promoted Walker to the position of part-time supervisor. (DSOMF ¶ 9). With the exception of a few weeks when he worked as a driver, Walker remained in the role of part-time supervisor until his termination. (Walker Dep., p. 48; Doc. 26-5).

UPS Policies and Procedures

UPS is an equal opportunity employer and prohibits discrimination, harassment, and retaliation based on sex, age, race, color, or any other status protected by law. (DSOMF ¶ 1). The company maintains a Code of Business Conduct, which expressly prohibits dishonesty, sexual harassment, and discrimination. (DSOMF ¶ 2). UPS also has a Professional Conduct and Anti-Harassment Policy. (DSOMF ¶ 3). This policy promotes a professional work environment by encouraging all employees treat one another with courtesy, consideration, and professionalism and by prohibiting discourteous and unprofessional workplace conduct. (DSOMF ¶¶ 3-4).

UPS provides a complaint process for employees to report objectionable conduct. (DSOMF ¶ 5). Upon receiving a complaint, UPS will conduct a prompt and thorough investigation of any alleged questionable conduct. (DSOMF ¶ 6). If

---

[1] "DSOMF" refers to those portions of Defendant's Statement of Undisputed Material Facts (Doc. 26-1) to which Plaintiff makes no objection.

the investigation substantiates the allegations, UPS will take immediate and corrective action. (DSOMF ¶ 7).

<u>Plaintiff's Disciplinary History</u>

UPS received the first allegation of Walker's unprofessional conduct in early 2013. (DSOMF ¶ 11). A caller identified as Askew reported Walker yelled at him for having his cellphone. (Doc. 26-6, p. 2). Askew claimed Walker "got in his face" and screamed he was "the wrong one to mess with." (<u>Id.</u>). The caller perceived this statement as a threat. (<u>Id.</u>). Askew walked away and reported the interaction to Walker's supervisor, Tim Allen. (<u>Id.</u>). There is no evidence UPS took any action against Walker based on this complaint. UPS followed up with Askew several months later, at which time Askew stated "things [were] going fine." (<u>Id.</u> at p. 3).

The next incident occurred in March 2013, when several employees were subjected to an unauthorized strip search by Walker, two other part-time supervisors, and a full-time supervisor. (Doc. 26-7). The purpose of the search was to locate cellular telephones missing from a delivery. (<u>Id.</u>). Walker admits he was present for the search but denies participating. (Walker Dep., p. 69-71). Following the incident, Walker signed the Professional Conduct and Anti-Harassment Policy. (<u>Id.</u> at p. 71). UPS denied Walker his merit raise for 2014 based on this occurrence. (Doc. 26-7, p. 2).

In December 2013, Walker was involved in an altercation with another UPS employee outside the workplace. (Walker Dep., p. 11-22; Doc. 26-8). Walker was leaving his son's basketball game when Leon Sacker approached him. (Walker

Dep., p. 11-12, 15-16). According to Walker, Sacker was an "unruly employee" and a "known problem" at UPS. (Id. at p. 14-15). On the date in question, Sacker followed Walker out of the basketball game and spit in his face. (Id. at p. 15-16). Walker shoved Sacker. (Id. at p. 16). About two weeks later, Walker received a summons to appear in court for a warrant hearing. (Id.). Walker testified that while he was never found guilty of any offense, he received probation for his role in the dispute. (Id. at p. 21-22).

Around this same time, UPS received a complaint from an unknown caller, who reported ongoing harassment by Walker. (Doc. 26-8). The caller claimed Walker was "nitpicking", calling him names, writing him up without cause, and using his authority to make work difficult for the caller. (Id.). The caller, who likely was Sacker, also stated Walker approached and pushed him at a children's sporting event. (Id.). The caller alleged Walker was not permitted to come within one hundred and ten feet of him. (Id.).

UPS addressed these allegations with Walker. (Id.). Walker admitted to the out-of-work confrontation but denied having any issues with the other employee at work. (Id.). UPS could not verify any no-contact restrictions between Walker and the caller. (Id.). UPS required Walker to read and sign the Professional Conduct and Anti-Harassment Policy. (Id.).

Walker wrote and signed the following statement on May 7, 2015:

I Wesley Jamar Walker, understand that if anyone says that Jamar have bothered any employee I will be fired from the company. I Jamar Walker if found to be unprofessional . . . will be terminated from UPS.

(Doc. 29-9). The impetus for this written statement is not clear from the record. However, Walker verified he wrote and signed the statement at the behest of HR Supervisor Cherie Morgan. (Walker Dep., p. 75-76). Walker also testified that he understood further unprofessional conduct could lead to his termination from UPS. (Id. at p. 76).

In February 2018, an unknown caller advised UPS that Walker was harassing the caller's mother, Geneva Brownlee. (Doc. 29-8). The caller claimed Walker was harassing Brownlee, requiring her to perform work outside her job description, and using vulgar language. (Id.). HR Supervisor Cherie Morgan investigated the allegations. (Id.; Morgan Dep., p. 49-54). Brownlee confirmed she felt harassed by Walker. (Doc. 29-8). Brownlee stated Walker commented on Brownlee's personal life, accusing her of begging for money to play lottery machines, referring to her as a "brokeass motherfucker", and telling her "he didn't want her broke ass." (Id.). Walker denied these allegations. (Id.). Morgan encouraged Brownlee to submit a formal statement and assured her she would not be retaliated against for reporting Walker's conduct. (Id.). Morgan reviewed the no retaliation policy and the Professional Code of Conduct and Anti-Harassment Policy with both Walker and Brownlee. (Id.).

<u>2019 Investigation and Plaintiff's Termination</u>

In March 2019, Tamika Sanks, who also worked as a part-time supervisor for UPS, met with HR Supervisor Cherie Morgan. (Doc. 26-10, p. 3). Sanks inquired how she could transfer to a different UPS facility. (Id.). She told Morgan

she felt like she could not "get anywhere at [her] current facility" and said she "was tired of working with Wesley Walker." (Id.). When Morgan asked for more information, Sanks described her tumultuous relationship with Walker. (Id.). Sanks told Morgan about a recent incident when Walker called Sanks during work and accused her of lying about him to another supervisor. (Id.). Walker told Sanks, "You better stop lying on me with your lying ass." (Id.). Sanks responded, "Get the fuck off my phone" and hung up. (Id.). The argument continued, with Sanks telling Walker to stop putting on a show, to which he said, "Put on a sho[w] for who? Ain't nobody try[ing] to put on a show but you better not lie on me again with your bald headed ass." (Id.).

Sanks further claimed that for several months leading up to this verbal altercation, Walker repeatedly put his hands in her face and tried to touch her lips. (Id.). Each time, she slapped or hit him. (Id.). Sanks said, "I figured I was handling that part of the aggravation and I never reported it because I felt like I was taking care of it and I didn't want to be terminated because I hit Wesley for touching my lips." (Id.).

Morgan opened an investigation. Walker provided a written statement on April 2, 2019, in which he denied any misconduct. (Doc. 26-10, p. 4-8). He accused Sanks of making false accusations and claimed he was always respectful of her, even after she cursed at him and hit him. (Id.). Walker then outlined all of Sanks' transgressions toward him, including eating his food without permission; referring to the size of his penis and saying it was not long enough to hang outside his pants;

pulling his chest hair; hitting, pushing, and cursing at him. (Id. at p. 4-6). Walker testified that Sanks also tried to sit in his lap in the office. (Walker Dep., p. 90). When he moved to avoid her, Sanks slapped him on the head and started choking him and pushing him out of the chair. (Id. at p. 90-91). While she was choking him, Walker could feel Sanks' breasts on the top of his head. (Id. at p. 202-03). He said she regularly made remarks of a sexual nature, such as, "Hey, there is something about you. I do want to fuck you." (Id. at p. 114). Walker said this sort of humiliating conduct occurred on an almost daily basis. (Id. at p. 94, 196, 201). Walker told his supervisor, who Walker claims witnessed some of Sanks' unwelcome advances, he was uncomfortable. (Id. at p. 92). The supervisor admittedly did not report Sanks' conduct to human resources, though he did inform Sanks that the comments were unprofessional. (Id. at p. 92-93, 111-112; Doc. 26-12).

Morgan took written statements from several other UPS employees familiar with the dynamics between Sanks and Walker. (Doc. 26-10, p. 9-10, 14-19). Charlie Ingram, Walker's supervisor, said, "The two are known to joke around and name call and at times are playfully physical." (Id. at p. 9). Jeffrey Hilton confirmed Walker and Sanks cursed and swore at each other. (Id. at p. 14). He commented, "I never had any supervisors in any of my jobs before talk to one and another in front of the employees like that." (Id.). Noah Hampton recalls hearing Walker and Sanks call each other "bald headed bitch" and "cross[-]eyed bitch." (Id. at p. 16). In Wilmer Vega's opinion, everything between Sanks and Walker started with "playing around" and "from there they just ke[pt] talking mad stuff." (Id. at p. 18).

Morgan reported her conclusions in an April 11, 2019 memo to Area HR Manager Keishia Mashore:

> My findings lead me to believe that there is something going on more than what was stated. I believe [Walker and Sanks] have been involved and now are having issues with each other, which is why [Sanks] is finding it hard to work with [Walker] now.[2]

(Id. at p. 2).

Morgan further opinioned,

> I believe that there will be continued problems o[f] this sort with [Walker and Sanks] because of the situation and I believe that they both were very unprofessional with the language they were using and their behavior in front of the hourly employees. I believe that [full-time] supervisor Charlie Ingram is aware that there is some form of love/hate relationship going on as well and that is why he did not interject when they were having the altercation because this is something that happens all the time with them.

(Id.).

Morgan noted in her memo to Mashore that between 2013 and 2018, Morgan had to review UPS's professionalism standards with Walker on multiple occasions. (Id.). She had to warn Sanks on one other occasion in 2018. (Id.). Morgan asked Mashore to advise what steps should be taken. (Id.).

On May 3, 2019, Walker called the UPS Hotline Phone to report his complaints of sexual harassment and lewd behavior by Tamika Sanks. (Doc. 26-12). Keishia Mashore investigated Walker's complaints. (Id.). Panise Perry, the HR Operations District Manager, then reviewed the case. (Id.). Like Morgan, Mashore

---

[2] Both Walker and Sanks denied any sort of romantic or sexual relationship. (Doc. 26-12, p. 4-5).

interviewed numerous UPS employees, each of whom confirmed inappropriate and unprofessional conduct by both Walker and Sanks. (Id.). She also spoke with Walker and Sanks. Walker told Mashore that Sanks "threw herself at him" and routinely made sexualized comments, such as "your dick isn't big enough for those pants" and "hey I want to do something about you, I want to fuck you." (Doc. 26-12, p., 4). When Mashore asked why Walker did not report Sanks' unprofessional conduct earlier, Walker responded "that every time there is an issue it gets turned around against him." (Id.).

Sanks described sexual remarks made by Walker. She claimed Walker commented that her lips looked soft and suggested that she wear "pants that fit." (Id. at p. 5). According to Sanks, Walker made these comments under his breath or when no one was around to hear. (Id.). Sanks denied ever saying anything about Walker's body parts but then admitted "they will say whatever to each other." (Id. at p. 5-6). Sanks claimed two months prior, Walker showed her a picture of his penis on his phone. (Id. at p. 6). Sanks did not report the incident "because she knew if she told that she had some things wrong as well." (Id.).

UPS determined that the allegations of sexual harassment and unprofessional conduct by Walker and Sanks were substantiated. (Id. at p. 8). UPS terminated Walker effective May 5, 2019, for violating UPS's Professional Conduct and Anti-Harassment Policy. (Doc. 26-14). UPS concluded termination was appropriate as UPS previously administered a final review of the UPS Professional Code of Conduct. (Doc. 26-11). UPS administered a final review of the Code of

Conduct to Sanks on May 2, 2019, and confirmed her understanding that any further reports of unprofessional conduct would result in her termination. (Id.).

<u>EEOC Complaint</u>

Walker filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 8, 2019. (Doc. 26-16, p. 2). Walker alleged in his charge that UPS discriminated against him based on his sex and retaliated against him for reporting harassment in the workplace. (Id.). The EEOC issued a Dismissal and Notice of Rights on September 12, 2019. (Id. at p. 3). This lawsuit followed.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." <u>Celotex</u>, 477 U.S. at 323 (internal

quotation marks omitted). If the movant meets this burden, the burden shifts to the party opposing summary judgment to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. Id. at 324-26. This evidence must consist of more than conclusory allegations. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Summary judgment shall be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## III.   DISCUSSION

### A.   Title VII

#### 1.   Sexual Harassment

Plaintiff asserts claims for both tangible employment sexual harassment and hostile work environment sexual harassment. Defendant moves for summary judgment as to each of these claims, arguing that Plaintiff has failed to produce evidence sufficient to make out a prima facie case.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). While Title VII does not specifically mention sexual harassment, the statutory phrase, "terms, conditions, or privileges of employment" includes within its scope a discriminatorily hostile or

abusive environment. Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999). A plaintiff seeking to prove sexual harassment under Title VII may rely on one of two theories. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753-54 (1998). Under the first theory, the plaintiff may establish a claim by proving that the sexual harassment culminated in a "tangible employment action." Id. Under the second theory, known as the "hostile work environment" theory, the plaintiff must prove that he suffered "severe or pervasive conduct." Id. at 754.

### a.    Tangible Employment Sexual Harassment

"Sexual harassment in the workplace can alter the terms and conditions of employment" when there is evidence that an "employee's refusal to submit to a supervisor's sexual demands result[ed] in a tangible employment action taken against [him]." Hulsey v. Pride Rests., LLC, 367 F.3d 1238, 1245 (11th Cir. 2004). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington, 524 U.S. at 761. "An employer is liable under Title VII if it (even unknowingly) permits a supervisor to take a tangible employment action against an employee because [he] refused to give in to [her] sexual overtures." Hulsey, 367 F.3d at 1245. "Tangible employment actions fall within the special province of the supervisor." Burlington, 524 U.S. at 762.

Plaintiff's claim for tangible employment sexual harassment fails for two reasons. First, the evidence before the Court indicates that Sanks, like Plaintiff,

was a part-time supervisor. (Walker Dep., p. 77). As nothing more than Plaintiff's co-worker, Sanks did not have the authority to make decisions impacting any tangible aspect of Plaintiff's employment. And, even if Sanks was Plaintiff's supervisor, Plaintiff has not demonstrated that his termination had any direct link to his refusal to accept Sanks' sexual advances. Plaintiff accordingly cannot make out a prima facie case of tangible employment sexual harassment, and Defendant is entitled to summary judgment as to this claim. The Court therefore **GRANTS** Defendant's motion for summary judgment.

### b.    Hostile Work Environment Sexual Harassment

A violation of Title VII arises when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). To prove a prima facie case for a hostile work environment based on sexual harassment, a plaintiff must show,

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment [was] based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 808 (11th Cir. 2010) (quoting Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999)). Defendant challenges the third, fourth, and fifth factors.

### i.  Based on Sex

The Eleventh Circuit has long recognized that a plaintiff can establish harassment was "based on h[is] sex" by showing "that but for the fact of [his] sex, [he] would not have been the object of harassment." Mendoza, 195 F.3d at 1248 n.5 (quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982)). The "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). The "crucial inquiry is whether the harasser treats a member or members of one sex differently from members of another sex." McCoy v. Macon Water Auth., 966 F. Supp. 1209, 1216 (M.D. Ga. 1997) (quoting EEOC Compliance Manual, § 615.2(b)(3)).

Viewed in the light most favorable to Plaintiff, there is ample evidence from which a reasonable factfinder could conclude that Sanks' conduct was overtly sexual in nature and that she directed her attention at Plaintiff because he is male. Sanks commented on the size of Plaintiff's penis and made remarks of a sexual nature, including that she wanted to "fuck [him]." (Doc. 26-12, p. 3-4; Walker Dep., p. 110-11, 114). Plaintiff testified Sanks threw herself at him and made frequent physical contact with him, including pulling his chest hair and brushing her breasts across the back of his head. (Doc. 26-12, p. 4; Walker Dep, p. 4-6, 88-90, 202-03).

Moreover, there is no evidence Sanks behaved this way toward non-male employees. Based on this evidence, a jury could find Sanks' interest in Plaintiff related to his male gender.

### ii.    Severe or Pervasive

Title VII does not serve as a "general civility code." See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Accordingly, "the statute does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." Oncale, 523 U.S. at 81. "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher, 524 U.S. at 788 (internal quotation marks and citations omitted). To be actionable, "a hostile work environment must be both objectively and subjectively offensive." Hulsey v. Pride Rests., LLC, 367 F.3d at 1247 (internal quotation marks and citations omitted). This means that a reasonable person would find the environment hostile and abusive and that the victim perceived it to be so. Id.

The Court first must determine whether Plaintiff subjectively perceived the harassment to be severe or pervasive. Reeves, 594 F.3d at 809 ("Either severity or pervasiveness is sufficient to establish a violation of Title VII.") (emphasis in original). To be actionable under Title VII, the victim must actually perceive that the work environment was hostile. Hulsey, 367 F.3d at 1247. "So long as the environment would reasonably be perceived, and is perceived, as hostile or

abusive, there is no need for it also to be psychologically injurious." Harris, 510 U.S. at 22.

Plaintiff testified that Sanks' sexualized remarks, comments about his genitals, and physical agressions made him feel uncomfortable and degraded as a man. (Walker Dep., p. 92-93, 114), 196. Plaintiff further stated Sanks' harassing conduct interfered with his ability to do his job. (Id. at p. 92-93, 196). Plaintiff explained,

> [W]hen I would come in each day, I was always having to be up under different circumstances of trying to avoid her, which caused me not to be able to do the job that I should've been doing. I always had to cut things short or either have to leave out of the office and get somebody to bring it to me to try to avoid her.

(Id. at p. 196). If believed, a reasonable factfinder could conclude Plaintiff subjectively perceived his work environment as hostile.

The Court next must evaluate whether Plaintiff's perspective is objectively reasonable. "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Oncale, 523 U.S. at 81 (quotation marks and citation omitted). In assessing the objective severity and pervasiveness of the harassment, courts typically consider "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening and humiliating or just a mere utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." Hulsey, 367 F.3d at 1247-48 (citing Faragher, 524 U.S. at 787-88). A plaintiff need not produce proof of each individual factor;

16

instead, the court should consider the totality of the circumstances. See id. at 1248 (citing Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002)).

Plaintiff alleges Sanks engaged in physically aggressive and demeaning conduct in addition to her generally vulgar and humiliating way of addressing Plaintiff. Plaintiff accuses Sanks of slapping him in the back of the head and trying to sit in his lap. (Walker Dep., p. 90). He also testified that she attempted to choke him. (Id. at 91). When Plaintiff asked her to stop, Sanks refused. (Id. at p. 92). Instead, her aggression escalated. (Id. at p. 93). Sanks punched, slapped, and threw Plaintiff on the floor. (Id.). Plaintiff testified that on another occasion Sanks slapped him and injured his lip. (Id. at p. 113). She engaged in this type of behavior almost every day for five months. (Id. at p. 94, 110).

Plaintiff has produced sufficient evidence which when viewed in a light most favorable to Plaintiff could lead a reasonable jury to conclude the harassment Plaintiff experienced was sufficiently severe or pervasive. First, there is evidence that Sanks' conduct was physically threatening and often demeaning. This conduct occurred on a regular basis over a five-month period. A jury further could reasonably draw the conclusion that the harassment interfered with Plaintiff's ability to perform his job. The Court accordingly finds Plaintiff satisfactorily established this prong of his prima facie case.

### iii.    Liability of Employer

Plaintiff's prima facie case fails at the fifth factor. "An employer is directly liable for hostile environment sexual harassment if it knew, or reasonably should

have known, of the harassment and failed to take prompt remedial actions." <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 647 (11th Cir. 1997) (citing <u>Faragher v. City of Boca Raton</u>, 111 F.3d 1530, 1538 (11th Cir. 1997)). An employer "need not act instantaneously[ ] but must act in a reasonably prompt manner to respond to the employee's complaint." <u>Frederick v. Sprint/United Mgmt. Co.</u>, 246 F.3d 1305, 1314 (11th Cir. 2001). The burden lies with Plaintiff to establish a basis for holding Defendant liable. <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802.

Plaintiff complains about the way Defendant conducted its investigation into Plaintiff's allegations of sexual harassment but does not otherwise question the timing of Defendant's response. Rather, the evidence demonstrates that once Defendant received a formal complaint of inappropriate conduct, Defendant promptly began investigating. Defendant thoroughly reviewed the complaints of Plaintiff and Sanks and found both Plaintiff and Sanks acted unprofessionally. Plaintiff accordingly has not satisfied his burden of establishing a basis for holding Defendant liable.

Plaintiff having failed to establish a prima facie case for a hostile work environment based on sexual harassment, the Court **GRANTS** Defendant's motion for summary judgment as to this claim.

### 2.    Gender Discrimination

To establish a prima facie case of gender discrimination, the plaintiff bears the burden of showing (1) that he belongs to a protected class; (2) that he was subjected to an adverse employment action; (2) that he was qualified to perform

the job; and (4) that the employer treated "similarly situated" employees outside his class more favorably. Holifield v. Reno, 115 F.3d 1555, 1561-62 (11th Cir. 1997). Defendant argues Plaintiff's claim fails as a matter of law because he cannot establish that a similarly situated employee outside his protected class was treated more favorably.

The Eleventh Circuit recently clarified what sort of showing "similarly situated" requires a plaintiff to make in Lewis v. Cty. of Union Cty., Ga., 918 F.3d 1213, 1224 (11th Cir. 2019). A proper comparator is one who is "similarly situated in all material respects," meaning she "cannot reasonably be distinguished." Id. at 1227-28. The "similarly situated" analysis takes into consideration a variety of factors, including whether the comparator (1) "engaged in the same basic conduct (or misconduct) as the plaintiff"; (2) was subjected "to the same employment policy, guideline, or rule"; (3) was managed by the same supervisor; and (4) shared "the plaintiff's employment or disciplinary history." Id.

Plaintiff here has not made out a prima facie case of gender discrimination because he and his proffered comparator—Tomika Sanks—were not similarly situated in all material respects. In particular, Plaintiff and Sanks did not share the same disciplinary history. The evidence shows that between 2013 and 2018, UPS required Plaintiff to sign the Professional Conduct and Anti-Harassment Policy on at least three occasions. (Doc. 26-7; Doc. 26-8). In a May 2015 written statement, Plaintiff acknowledged that any further infractions would result in the loss of his job. (Doc. 29-9).

Sanks did not share a similar disciplinary history. Plaintiff admitted in his deposition that he was not aware of Sanks' disciplinary history. (Walker Dep., p. 77-78). He knew only that he "was jobless and Tomika Sanks kept her job." (Id. at p. 199-200). The undisputed evidence shows, however, that prior to the 2019 investigation that culminated in Plaintiff's termination, Sanks received counseling for her unprofessional behavior only once in 2018. (DSOMF ¶ 37). Furthermore, Plaintiff has presented no evidence supporting his allegations that Sanks committed but was not disciplined for other infractions similar to those for which Defendant disciplined Plaintiff.

There being no evidence from which a fact finder could conclude Defendant treated Plaintiff less favorably than a similarly situated female employee, Plaintiff's claim of gender discrimination fails as a matter of law. The Court accordingly **GRANTS** Defendant's motion for summary judgment on Plaintiff's Title VII claim for gender discrimination.

### 3.    Retaliation

Plaintiff alleges Defendant terminated him in retaliation for reporting Sanks' alleged acts of sexual harassment, in violation of Title VII. Title VII prohibits employers from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e-3(a). Retaliation claims based on circumstantial evidence, like Plaintiff's, are analyzed under the McDonnell Douglas burden-shifting framework. Johnson v. Miami-Dade Cnty., 948 F.3d 1318, 1325 (11th Cir. 2020). Under that framework,

the plaintiff first must establish a prima facie case of retaliation, showing (1) he engaged in statutorily protected conduct; (2) he suffered an adverse action; and (3) "there is some causal relationship between the two events." Id. (internal quotation marks omitted). The burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. Id. Once that burden is met, "the burden shifts back to the plaintiff to establish that the reason proffered by the [employer] was not the real basis for the decision, but a pretext" for retaliation. Id. (internal quotation marks omitted). To establish the necessary causation, the plaintiff must demonstrate that his "protected activity was the but-for cause of the alleged adverse action by the employer." Univ. of Tx. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013).

Neither party directly addresses whether Plaintiff established a prima facie case of retaliation. However, the evidence is undisputed that Plaintiff complained to Defendant that Sanks was sexually harassing him. The evidence is further undisputed that Defendant terminated Plaintiff following the investigation into that complaint. As to the causation element, the Eleventh Circuit has explained that the causal link element should be broadly construed so that "a plaintiff merely has to prove that the protected activity and the . . . [adverse] action are not completely unrelated." Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998). A plaintiff may establish this element by providing evidence of a close temporal proximity between the protected expression and the adverse action. Id. "[A] period as much as one month between the protected expression and the adverse action

21

is not too protracted." Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004) (citing Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1457 (11th Cir. 1998)); but see Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (citing with approval decision in which three to fourth month gaps were found to be insufficient to show a causal connection).

Here, Plaintiff called Defendant's Hotline Phone on May 3, 2019, to report Sanks' lewd behavior. Defendant terminated Plaintiff effective May 5, 2019. The two-day period between the time Plaintiff engaged in protected activity and his termination is sufficient to satisfy the causation element.

Having determined that Plaintiff established a prima facie case of retaliation, the burden of production now shifts to Defendant to articulate a legitimate, non-retaliatory reason for terminating Plaintiff. Defendant has articulated such a reason. Defendant explained that it fired Plaintiff based on repeated violations of Defendant's Professional Code of Conduct and Anti-Harassment Policy. Between 2013 and Plaintiff's termination in 2019, Defendant counseled Plaintiff on at least three occasions for engaging in offensive conduct, including cursing at and intimidating other employees and participating in a strip search. Defendant received two complaints about Plaintiff's treatment of other employees in 2013. In 2015, Defendant placed Plaintiff on notice that continued unprofessional conduct would result in his termination. Defendant received yet another complaint alleging Plaintiff engaged in unprofessional conduct in 2018. Upon receiving and investigating Sanks' complaint in 2019, Defendant then made the decision to

terminate Plaintiff. Defendant thus has rebutted the presumption arising from Plaintiff's prima facie case that Plaintiff's termination was the product of Defendant's intent to retaliate.

To defeat Defendant's motion for summary judgment, Plaintiff next must demonstrate that Defendant's proffered reasons for terminating him were merely pretextual and that but for Plaintiff asserting his sexual harassment complaint against Sanks, Defendant would not have fired him. "Provided . . . the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it." Chapman v. AI Trans., 229 F.3d 1012, 1030 (11th Cir. 2000). To establish pretext, a plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (quotation omitted). "[A] reason is not pretext for [retaliation] unless it is shown *both* that the reason was false, *and* that [retaliation] was the real reason." Springer v. Convergys Customer Mgmt. Grp., Inc., 509 F.3d 1344, 1349 (11th Cir. 2007) (emphasis in original) (internal quotation marks and citation omitted).

Plaintiff has not met his burden of showing that but for instituting his complaint against Sanks, Defendant would not have fired him. Rather, the evidence establishes that Defendant had cause to terminate Plaintiff prior to his May 2019 complaint. Review of that complaint only provided further justification for

Defendant's decision. By 2018, Plaintiff had already been disciplined for unprofessional conduct on at least three occasions. In 2015, Defendant required Plaintiff to sign a written statement acknowledging that further infractions could lead to his termination. The evidence shows that after investigating Sanks' April 2019 complaint of harassment perpetrated by Plaintiff, Defendant was already poised to take action against both Plaintiff and Sanks. That investigation led Defendant to the conclusion that Plaintiff and Sanks were equally unprofessional. The additional interviews conducted after Plaintiff's May 2019 complaint only confirmed that assessment. Plaintiff has pointed to no evidence in the record supporting an inference that Defendant would not have terminated Plaintiff but for his complaint against Sanks. Plaintiff thus has failed to produce evidence from which a reasonable jury could find that but for his complaint against Sanks he would not have been fired. Defendant therefore is entitled to summary judgment.

### B.    State Law Claims

#### 1.    Damage to Reputation

Plaintiff asserts Defendant is liable for damage to his reputation resulting from his termination. "[D]amages for injury to reputation . . . are generally not recoverable in an action premised on mere negligence where no physical injury is suffered by the plaintiff, unless the elements of willfulness or wantonness have entered into the case." Hamilton v. Powell, Goldstein, Frazer & Murphy, 167 Ga. App. 411, 415 (1984). Plaintiff has presented no evidence in support of this claim.

The Court therefore **GRANTS** Defendant's motion for summary judgment on Plaintiff's damage to reputation claim.

### 2.    Intentional Infliction of Emotional Distress

The evidence does not support Plaintiff's claim for intentional infliction of emotional distress. To recover on an intentional infliction of emotional distress claim, a plaintiff must show that "(1) defendant['s] conduct was intentional or reckless; (2) defendant[']s conduct was extreme and outrageous; (3) a causal connection existed between the wrongful conduct and the emotional distress; and (4) the emotional harm was severe. Abdul-Malik v. AirTran Airways, Inc., 297 Ga. App. 852, 856 (2009). Georgia law in general does not recognize termination as rising to the level of intentional infliction of emotional distress. Beck v. Interstate Brands Corp., 953 F.2d 1275, 1276 (11th Cir. 1992) (Georgia is an at-will employment state and does not recognize wrongful discharge of at-will employees); see also Phillips v. Pacific & S. Co., 215 Ga. App. 513, 515 (1994) (discharge for whatever reason, "without more, gives rise to no claim for the intentional infliction of emotional distress"). Accordingly, in order for Plaintiff to recover for intentional infliction of emotional distress, he must demonstrate more than wrongful discharge. He must point to evidence of conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Renton v. Watson, 319 Ga. App. 896, 903 (2013). "Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain

a claim for intentional infliction of emotional distress is a question of law."
Miraliakbari v. Pennicooke, 254 Ga. App. 156, 157 (2002).

Plaintiff's unsupported allegations that Defendant engaged in reckless and extreme conduct are not sufficient to elevate Plaintiff's claims of misconduct to the requisite level of outrageousness required to maintain a claim for intentional infliction of emotional distress. Defendant is therefore entitled to judgment as a matter of law.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment. (Doc. 26). Judgment shall be entered in favor of Defendant.

**SO ORDERED,** this 26th day of September, 2022.

_s/ Hugh Lawson_____
**HUGH LAWSON, SENIOR JUDGE**

aks